**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1229-16T2

MARK J. RAGNACCI and
AURELIA RAGNACCI,
husband and wife,

      Plaintiffs-Appellants,

v.

MEDHAT GHABA,

      Defendant-Respondent.

_____

Argued October 24, 2018 – Decided August 28, 2019

Before Judges Nugent and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-1339-14.

Kenneth William Thayer argued the cause for appellants (Gaylord Popp LLC, attorneys; Kenneth William Thayer, on the brief).

Lori A. Kaniper argued the cause for respondent (Sponder & Sellitti, attorneys; Lori A. Kaniper, on the brief).

PER CURIAM

Plaintiff, Mark J. Ragnacci, appeals from an order that dismissed his personal injury action after a jury returned a verdict of no cause of action.[1] The jury found plaintiff had not suffered a permanent injury as defined in the limitation on lawsuit option ("verbal threshold"), N.J.S.A. 39:6A-8(a). Plaintiff contends the trial court committed reversible error by allowing defense counsel to cross-examine plaintiff's medical expert about the percent of partial total disability to the neck and back the expert had once opined plaintiff had sustained in a workers' compensation accident. We conclude that, if error, the admission of the testimony was harmless. Accordingly, we affirm.

Defendant Medhat Ghaba stipulated to liability for causing the November 2012 rear-end collision in which plaintiff was injured. Plaintiff conceded he was subject to the verbal threshold. During trial, the parties mostly disputed the cause and extent of the injuries to plaintiff's neck or cervical spine, left shoulder, and lower back or lumbar spine. Plaintiff claimed his injuries were caused by the accident and were permanent, that is, they "ha[d] not healed to function normally and [would] not heal to function normally with further medical treatment." N.J.S.A. 39:6A-8(a). Defendant claimed he was exempt from

---

[1] Because plaintiff Aurelia Ragnacci's per quod claim is derivative, and because the sole issue on appeal involves Mark J. Ragnacci only, we refer to him in his opinion as "plaintiff."

liability for noneconomic loss because plaintiff suffered no permanent injuries in the accident.

To prove he suffered a permanent injury, plaintiff described the impact caused by the collision—"pretty good"—and presented evidence about the moderate damage to the two vehicles. He drove to his home after the accident and had his wife take him to a hospital emergency room. There, he complained of neck and shoulder pain. Hospital personnel took x-rays, prescribed medication, and discharged him.

Approximately a week later, plaintiff came under the care of Dr. Barry Douglass Fass, a board-certified physiatrist, a specialist in physical medicine and rehabilitation. The doctor and the medical personnel in his office treated plaintiff for the impairment and pain in his neck, shoulders, middle-back and lower back. Plaintiff was also experiencing tingling through his left leg. He remained under Dr. Fass's care from November 29, 2012 through October 8, 2013.

Plaintiff's treatment included chiropractic manipulation, electrical stimulation, hot compresses, and physical therapy. Two months into his treatment, on December 26, 2012, plaintiff underwent magnetic resonance imaging (MRI) of his cervical and lumbar spine. As the result of deficits the

3

MRIs revealed, plaintiff's treatment changed to invasive modalities, including what plaintiff described as injections of Novocain into his neck and lower back, and an injection into his spinal column under general anesthesia. He also had electromyography (EMG), which showed pain was "radiating" or going down into both his legs "but more into the left leg." Dr. Fass referred him for a consultation with a surgeon.

According to plaintiff, his treatment with Dr. Fass ended in October 2013 "[b]ecause they couldn't do any more for me." Although the treatment ended, plaintiff's pain and impairment continued. He described for the jury his ongoing pain and discomfort, as well as the continuing impairment that affected his ability to sleep, perform routine daily activities, play with his child, and have a normal relationship with his wife. His wife testified and corroborated his testimony. During plaintiff's testimony, he explained that the injuries he suffered to his neck and lower back in a 2007 work accident were not really causing him discomfort before the 2012 automobile accident.

The three doctors who testified described the function of intervertebral discs. One analogized a disc to the "tired analogy [of] a jelly doughnut or tire." A disc has "an outer lining or an outer skin [like] a jelly doughnut. The inside is a gelatinous material called the nucleus that's made up of various . . .

components that allow shock absorption movement and provides some stability." Bulges and herniations describe the contour of the disk. A bulge could be analogized to the flattening of a tire, whereas a herniation, which is more focused, could be analogized to a protruding bubble in a tire.

Another doctor explained that in a normal disc the spinal cord is in the middle surrounded by fluid, which acts as a lubricant and allows sliding and bending forward and backward. If a disc herniates, there is a tear in the rim that holds it. By definition, a disc bulge has no focality and is three millimeters or less, whereas herniations are three millimeters or more and have a "focal hook."

Plaintiff presented the testimony of a board certified radiologist who interpreted the December 2012 MRIs. She said the cervical MRI showed herniated cervical discs at C2-3 and C5-6. The herniations appeared to be "newer" because they showed no signs of degeneration, which occurs over time after a disc herniates. The lumbar MRI showed both bulging and a herniation at the L4-5 disc. The herniation was seven millimeters and compressed the spinal cord. The MRI also revealed a disc herniation at L5-S1 with impingement of the "S-1 root." According to the radiologist, the impingement of the nerve root by the L4-5 disc was not a degenerative condition. The herniations were permanent, abnormal conditions.

Dr. Fass, plaintiff's treating physician, recounted plaintiff's course of treatment, reviewed the diagnostic studies, including an EMG of plaintiff's legs that revealed "acute nerve damage in the lower part of both legs which correlated with the nerve that was injured from the disc," and explained his final diagnosis and prognosis. When he discharged plaintiff, the doctor's diagnosis included "bilateral L5-S1 radiculopathy," that is, damage to a "low back nerve that goes into his leg." His final diagnosis also included cervical, thoracic, and left shoulder strain; disc herniations at C2-3, C5-6, L4-5, and L5-S1; and disc bulging at L4-5.

Dr. Fass opined that plaintiff had sustained permanent injuries to his neck and lower back caused by the accident. According to the doctor, plaintiff's injuries were structural and were not going to heal to plaintiff's pre-injury state. Consequently, "[plaintiff] would continue to experience discomfort and limitations of his activities into the future."

Plaintiff's counsel asked Dr. Fass about the injuries plaintiff had suffered in the previous work accident. The doctor explained that plaintiff's primary injury in the work accident was to his ulnar nerve. The nerve damage was not affected or exacerbated as a result of the automobile accident. Concerning the neck and back injuries plaintiff sustained in the work accident, Dr. Fass said that

6

when he first saw plaintiff following the automobile accident, plaintiff "noted that his neck and back pain had improved and he was performing normal daily activities up until the time of the [automobile] accident."

Dr. Fass explained that plaintiff did not have radiating pain or numbness into his legs following the work accident; those symptoms developed after the motor vehicle accident. The doctor added, "the disc abnormalities by MRI were significantly worse following the 2012 motor vehicle accident including the herniation pressing the nerve at . . . L5-S1 causing that, to me, in my opinion . . . the numbness . . . in his legs was never present prior to the motor vehicle accident."

The court had ruled during argument on a pretrial motion in limine that defendant could cross-examine the doctor about plaintiff's prior workers' compensation accident. Dr. Fass had written a report for plaintiff in which he opined as to the percent of partial permanent disability plaintiff had suffered to his cervical and lumbar spine in the work accident, and the court had ruled the doctor could be cross-examined about that. Based on its analysis under N.J.R.E.403, the court concluded such evidence had probative value that was not substantially outweighed by countervailing factors such as undue prejudice

A-1229-16T2

or confusion of issues. In addition, the court determined the differences could be adequately explained to the jury.

Apparently anticipating such cross-examination, plaintiff's counsel prefaced a question to Dr. Fass with this remark: "I assume on cross[-]examination you're going to be asked some questions on those prior evaluations you did for the purposes of workers' compensation." Counsel then questioned the doctor extensively about the subject.

Plaintiff's counsel asked the doctor to explain the difference between a workers' compensation evaluation on one hand, and rendering an opinion as a treating physician in a vehicular negligence case on the other. During his explanation, the doctor noted about workers' compensation claims, "New Jersey State has its own standard of different—hundreds of different injuries and each one of them has some type of percentage of total body part." The doctor noted that was why in workers' compensation he was required to opine on "a percentage of injury of a specific body part[.]" The doctor also explained the differences in the definitions of permanent disability for workers' compensation and permanent injury in vehicular accident cases. The doctor said the two areas of law provided "separate classification[s] and . . . separate regulations and laws regarding . . . what's considered work comp and what's considered through a

motor vehicle. So the verbiage is different." He added that he was not asked to come up with percentages for motor vehicle accidents; percentages are required in workers' compensation claims. The doctor told the jury, "it's basically just a different type of, you know, procedural and verbiage and language for different accidents. It could be the same part of the body but . . . you have to come [up] with a different form depending on . . . which type of accident it was."

The doctor concluded that the automobile accident "was an aggravation of neck and back injuries with worsening disc abnormalities. The nerve damage to the legs was never present so that's a . . . brand new injury."

Defense counsel did not ask on cross-examination about the percent of partial permanent disability Doctor Fass had opined plaintiff suffered to his cervical and lumbar spine in the workers' compensation accident. Following cross-examination and redirect examination, defense counsel brought out on re-cross-examination that the doctor had found "permanency" as a result of the workers' compensation accident. This is the exchange:

> [Defense Counsel]: And in fact you indicate a percentage of permanent partial disability for purposes of workers' comp but that's what you say in your examination and your narrative report of 2010, correct?
>
> [Doctor]: I do. Yes.

[Defense counsel]: And in fact you specifically say in your last report, November 30, 2010, [fifty-five percent] permanent partial disability of the cervical spine, correct?

[Doctor]: Yes.

[Defense Counsel]: Fifty-five percent permanent partial disability of the left upper extremity, correct?

[Doctor]: Yes.

[Defense Counsel]: And [fifty] percent permanent partial disability of the lumbar spine, correct?

[Doctor]: Yes.

Plaintiff's counsel asked follow-up questions on further redirect examination. Specifically, he asked the doctor how percentages required under workers' compensation law differed from an opinion of permanency in an automobile accident case. The doctor essentially reiterated the answers he had originally given during direct examination.

Dr. Alan Sarokhan, a board certified orthopedic surgeon, testified for the defense. He examined plaintiff at the request of defendant, and he reviewed plaintiff's medical records, including the MRI studies. He noted plaintiff had sustained injuries to his neck and back in a work accident in 2007, and medical records documented continuing pain or impairment from those injuries through

2010 or 2011. The doctor pointed out that plaintiff underwent permanency evaluations for his workers' compensation claim.

Dr. Sarokhan reviewed MRI studies of plaintiff's neck and back that were completed in 2007—following the workers' compensation accident—and compared them to the December 2012 MRI studies. He explained what a doctor would expect to see on an MRI study following traumatic injury to the spine and said he found no evidence of trauma on the 2015 MRI studies.

On the other hand, the doctor testified the 2007 studies showed significant degenerative changes in plaintiff's cervical and lumbar spine. He described the degenerative process, explained how over years degeneration could result in spinal disc herniations and bulging, and concluded the deficits seen on the December 2012 MRIs were caused by a normal degenerative process in plaintiff's spine that was evident five years earlier following the 2007 work accident. The doctor also told the jury that radiculopathy is not an injury, but rather "simply an electrical diagnosis." The doctor said "the overwhelming majority of radiculopathy can be resolved[.]" The doctor thus concluded, more likely than not, plaintiff's "radiculopathy" was not permanent.

In its charge, the court instructed the jury about the workers' compensation accident:

You have heard testimony and argument regarding the plaintiff's claim in workers' compensation court. Please understand that the term permanency as used in the workers' compensation court case has different legal standards than the term permanent injury used in this case and as provided to you in these instructions. The permanency evidence from the workers' compensation case may be considered by you, along with all of the other evidence in this case in evaluating whether or not plaintiff sustained a permanent injury that was [proximately] caused by the November 23, 2012 accident. Once again, you're instructed that the legal standard you must follow to determine whether plaintiff sustained a permanent injury is the legal standard contained in this jury instruction.

The jury returned its verdict by answering "No" to the following question: "Has the plaintiff Mark Ragnacci proven by a preponderance of the evidence that he sustained a permanent injury that was proximately caused by the November 23, 2012 accident?" This appeal followed.

On appeal, plaintiff argues, "the testimony as to prior findings of partial permanent disability predicated upon estimates of percentages of partial permanency, which came to light on questioning on re-cross and not cross, was misleading to the jury and caused confusion and undue prejudice in violation of N.J.R.E. 403." Plaintiff contends the workers' compensation percentages of disability had no bearing on the verbal threshold issue the parties were litigating at trial. Plaintiff further contends the admission of this testimony was

exacerbated by the court's inadequate instruction to the jury, which did not explain "the meaning and the significance of the estimates of partial permanent disability presented to the jury during the charge phase of the trial."

Our trial courts are vested with broad discretion in determining whether proffered evidence is relevant, and if so, whether it should be excluded under N.J.R.E. 403 because its probative value is substantially outweighed by the risk of undue prejudice, confusion of issues, misleading the jury, or other considerations. Wymbs v. Twp. of Wayne, 163 N.J. 523, 537 (2000). For that reason, we review such decisions for abuse of discretion. Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010). A party may demonstrate such an abuse of discretion by establishing the trial court's ruling resulted in "manifest error or injustice," Hisenaj v. Kuhner, 194 N.J. 6, 20 (2008) (quoting State v. Torres, 183 N.J. 554, 572 (2005)); or by demonstrating "there has been a clear error of judgment." State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

Here, plaintiff has demonstrated neither manifest error, injustice, nor a clear error of judgment. The percent of partial permanent disability plaintiff suffered to his neck and back in the work accident arguably had probative value. Plaintiff's expert testified that the injuries plaintiff sustained in the automobile

13

accident aggravated and exacerbated the cervical and lumbar injuries plaintiff had sustained in the work accident. The percentages could have aided the jury by providing a more concrete understanding of the extent of the aggravation.

That said, the testimony potentially opened the door to plaintiff eliciting testimony from Doctor Fass concerning the percentage of partial permanent disability plaintiff was left with in his neck and back following the automobile accident. That would have led to an undue distraction: arguments about percentage of injuries relevant to the precise compensation a petitioner is entitled to as the result of a workers' compensation accident, but having little to do with the compensation a plaintiff is entitled to in a negligence action, and little if anything to do with the verbal threshold's definition of a permanent injury. The better course would have been to bar questions about percentages of partial permanent disability and confine questioning to the doctor's opinion that plaintiff had previously suffered permanent injuries.

Regardless, even if admission of the testimony was error, it was harmless. R. 2:10-2. Plaintiff's treating physician provided a lucid explanation of the differences of the deficits in plaintiff's cervical and lumbar spine based on comparison of the MRI studies following the work accident with those following the vehicular accident. The defense expert gave an equally lucid explanation of

the differences, but attributed them to a degenerative process, rather than the automobile accident.

In addition, plaintiff's treating physician provided the jury with a clear explanation of the difference in terminology and criteria between workers' compensation cases and verbal threshold cases. Not only did plaintiff's treating physician clearly explain the differences, but the trial court adequately instructed the jury on how it could consider testimony about the percentages of partial permanent disability that plaintiff's treating physician had given in the workers' compensation case.

In short, it was clear from the expert testimony and the court's instruction to the jury that the central issue in the case was whether the injuries evidenced by the spinal disc deficits displayed on the post-vehicular accident MRI films were caused by trauma from the automobile accident or resulted from a degenerative process. Considering all of the evidence presented to the jury, the arguments of counsel, and the trial court's instruction, it cannot be reasonably concluded that the brief testimony of plaintiff's physician about disability percentages, on re-cross examination, was of such a nature as to have been clearly capable of producing an unjust result. R. 2:10-2.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15

A-1229-16T2